**STATE of Maine**

v.

**Mark CONNER.**

Supreme Judicial Court of Maine.

Argued May 13, 1981.

Decided Sept. 8, 1981.

Charles K. Leadbetter, William Stokes, Asst. Attys. Gen., John S. Gleason, Deputy Atty. Gen. (orally), Augusta, for plaintiff.

Franklin F. Stearns, Jr. (orally), Portland, for defendant.

Before McKUSICK, C. J., and WERNICK, NICHOLS, ROBERTS and CARTER, JJ.

CARTER, Justice.

The defendant, Mark Conner, was convicted of murder, 17–A M.R.S.A. § 201(1)(A),[1] following a jury trial in the Superior Court (Cumberland County). On appeal, the defendant argues (1) that the prosecutor's closing argument deprived him of a fair trial, and (2) that the trial court erred by admitting into evidence a gruesome photograph of the victim. While we find error in the admission of the photograph, such error is harmless. Therefore, we affirm the judgment.

The elderly victim, Anthony Piacentini, worked in April, 1979, as manager of Pine Tree Billiards in Portland. The defendant testified to the following: On the morning of April 18, the defendant went armed to Pine Tree Billiards in order to "get some money." When the defendant first entered, both the victim and another man were present. The defendant stood in the doorway a while, then left at the same time as the other man. Shortly thereafter the defendant returned, pulled out a gun, cocked it, and entered Pine Tree Billiards. He told

---

1. 17–A M.R.S.A. § 201(1)(A) provides: A person is guilty of murder if: He intentionally or knowingly causes the death of another human being. . . .

the victim that it was a hold-up, and ordered the victim to lie down. The defendant testified that his hand was shaking and the next thing he knew the gun went off. The victim fell to the floor and started moaning. The defendant took the victim's wallet from his person and left. The defendant was not wearing a mask, and had been at Pine Tree Billiards ten or fifteen times before. The defendant then went to the apartment of Arthur Logan.

Logan testified that the defendant told him "that he shot [the victim] because he was—[the defendant] said the man was reaching in the back of his pocket, so [the defendant] thought probably the man had something too." Other witnesses testified that on two other occasions the defendant said that he thought that the victim was reaching for a gun. Witnesses also testified that the defendant was calm after the shooting, slept the afternoon, went out to a local dance establishment and played pool later that evening.

Dr. Roy, a pathologist, examined the deceased's body at the scene of the shooting. During his testimony, several color photographs were introduced into evidence without objection by the defendant. The defendant questioned the admission of only one of those photographs at trial. Described generally, four of these photographs depict various views of the scene of the shooting and show the position of the deceased's body at the scene. Two of these photographs, apparently taken in the course of the examination of the deceased's body, are partial views of the body depicting the bullet's entrance wound and the location of the spent bullet when found. The body is in the approximate position in which it was discovered in both of these photographs. These two exhibits show that the bullet entered the victim's body behind the left shoulder and exited on the right side of the front of the chest.

Exhibit 4, the only photograph objected to by defendant, depicts the upper half of the deceased's body, stripped to the waist, and rolled on its back. The victim's face is plainly visible and appears contorted by the agonies of a violent death. The body is bloody. The photograph depicts the exit wound in the victim's right chest. This photograph was admitted in evidence over objection by defense counsel that it was so gruesome as to unfairly inflame and prejudice the jurors.

In his closing argument, the prosecutor said: "[the victim] may be an elderly man, may not be handsome to everyone except to those who loved him, but that doesn't give [the defendant] the right to kill him, to treat him like a dog, and to have no more thought about it than he would if he'd crushed an insect." The defendant objected, and the court told the jury to disregard the characterization. The defendant did not move for a mistrial.

I.

■ In response to the defendant's objection to the prosecutor's closing argument, the trial judge cautioned the prosecutor, and asked the jury to disregard the characterization. The defendant did nothing further. He neither asked for a mistrial, nor did he argue that the prosecutor's remarks were so dramatic that it would expect too much of human nature to believe the jurors could forget or disregard them. Therefore, the defendant must be taken to have acquiesced in the curative approach which the trial judge thought adequate. *See State v. Brown*, Me., 410 A.2d 1033, 1036–37 (1980).

■ We find here no obvious error affecting substantial rights. The defendant argues that the reference "to those who loved him" was an improper reference to the victim's family designed to prejudice and inflame the jury. While a prosecutor should avoid referring in the closing argument to the victim's family, such a reference does not automatically require reversal. The materiality and the manner of presentation of the comments must be considered. *People v. Mitchell*, 78 Ill.App.3d 458, 460–61, 33 Ill.Dec. 823, 826, 397 N.E.2d 156, 159 (1979); *see People v. Golson*, 32 Ill.2d 398, 408–11, 207 N.E.2d 68, 74–75 (1965). Here, even when we treat this reference as one referring to the victim's fami-

ly, the reference was brief, and it was not repeated after the court's cautioning.

> This Court generally defers to the determination of a presiding Justice, who has the immediate feel of what is transpiring, that a curative instruction will adequately protect against the jury's giving consideration to matters which have been heard but have been stricken as evidence. *See State v. Butts*, Me., 372 A.2d 1041, 1042 (1977).

*State v. Brown*, 410 A.2d at 1037.

As for the prosecutor's comment as a whole, there is evidence which supports that characterization of the defendant's conduct. The defendant admitted taking the victim's wallet after shooting him, and leaving him "moaning" on the floor to die. Witnesses testified that the defendant was calm after the shooting, slept that afternoon, and went out to dance and play pool that evening. This evidence of indifference and lack of remorse tended to rebut the defendant's testimony that the shooting was accidental. "As is permitted to the debator in parliamentary contests the legal advocate may employ wit, satire, invective, and imaginative illustration in his arguments before the jury, both in civil and criminal trials, but in this the license is strictly confined to the domain of facts in evidence." *State v. Martel*, 103 Me. 63, 66, 68 A. 454, 455 (1907); *see State v. Britt*, 288 N.C. 699, 711–12, 220 S.E.2d 283, 291 (1975).

## II.

■ "The long-standing rule in Maine is that it is within the sound discretion of the trial court to exclude photographs on the basis of unfair prejudice that outweighs the probative value of the exhibit." *State v. Woodbury*, Me., 403 A.2d 1166, 1169 (1979). We have recognized that a gruesome photograph depicting a murder victim has the potential for prejudicially inflaming the emotions of the jury against the defendant,

and that under some circumstances its admission would be error. *Id.* We find such circumstances here, but conclude that the error was harmless.

■ The critical factor in this balancing test is the significance of the photograph in proving the State's case. Where the photograph has minimal significance, e. g., where it is probative only of uncontroverted facts, or where its value is merely cumulative of other less prejudicial evidence, then it is the responsibility of both the prosecutor and the trial court to examine closely those photographs that are arguably prejudicial; where the photograph has essential evidentiary value,[2] then even a gruesome photograph may properly be admitted into evidence. *See Commonwealth v. Chacko*, 480 Pa. 504, 507–10, 391 A.2d 999, 1001–02 (1978) (Roberts, J., concurring); *Commonwealth v. Garrison*, 459 Pa. 664, 331 A.2d 186 (1975); *see also People v. Lefler*, 38 Ill.2d 216, 221–22, 230 N.E.2d 827, 830 (1967); *People v. Falkner*, 389 Mich. 682, 209 N.W.2d 193 (1973); *Lanham v. State*, 474 S.W.2d 197, 199 (Tex.Crim.App. 1971). There is a wide range available for the proper exercise of the trial court's discretion, the result depending upon the circumstances in the particular case. In making such a discretionary judgment on admissibility of a photograph, the trial court must strike a rationally justifiable balance between the evidentiary value of the depiction afforded by the photograph in the total circumstances of the trial, on the one hand, and its potential, on the other hand, to cause inflammatory prejudice because of the gruesome aspects of the depiction.

■ Even where a gruesome photograph is properly admissible, the prosecutor and the trial court should take steps to reduce the potential for prejudice, if possible. Some steps can be taken before the victim is photographed, such as cleansing the blood from the body or the victim's face.[3] *See*

---

**2.** The trial court may require the state to demonstrate its need for using a particular photograph before admitting it into evidence; the court may exclude a photograph early in a trial,

but allow it into evidence later if it becomes necessary.

**3.** We do not intend to imply that the trial court should exclude a photograph solely because at

*Commonwealth v. Brueckner*, 458 Pa. 39, 44–45, 326 A.2d 403, 406 (1974). At trial, portions of the photograph might be excised or covered before the jury is allowed to see it, *see id.; People v. McCrary*, 190 Colo. 538, 553–54, 549 P.2d 1320, 1332 (1976), or black and white photographs might be substituted in place of color photographs. While color makes a photograph more accurate, it may also increase its "gruesomeness." *Cf. State v. Duguay*, 158 Me. 61, 64, 178 A.2d 129, 131 (1962); *Chacko*, 480 Pa. at 506, 391 A.2d at 1000; *State v. Poe*, 21 Utah 2d 113, 116–18, 441 P.2d 512, 514–15 (1968).

■ In the instant case, the color photograph of the victim depicted the bullet exit wound in the upper right chest area. The chest is bloody, and the distorted face of the victim is shown. The photograph is fairly characterized as gruesome. We find that the essential evidentiary value in the photograph is tenuous in the extreme. The identity of the victim was not disputed; it was not necessary to use this photograph to establish identity. The location of the exit wound was adequately described by the pathologist, and the photograph was cumulative of that testimony. If proper steps had been taken to lessen the prejudice, primarily if the victim's face had been covered or excised from the photograph, there might have been no error in admitting it. Without such precautions, however, its admission was an abuse of discretion.

At oral argument, the prosecutor refused to concede that the photograph in question had any dangerous potential for prejudice to the defendant by reason of its propensity to inflame the jurors because of the gruesomeness of its depiction of the victim. Fundamental fairness calls for a more refined sensitivity to the prejudice that may be done by the unnecessary entry into evidence in a criminal proceeding of inflammatory photographs, especially where the prosecutor's judgment can be brought to bear *before* the error is committed, thus preventing its occurrence. It is true that an emi-

nent text on the Maine law of evidence on this point fails to encourage such sensitivity. We point out the dangers that inhere in its analysis as set forth:

A familiar area of controversy in criminal proceedings lies in the objection to the admission of gruesome photographs on the ground that their probative value is outweighed by their prejudicial effect. *In every case that has gone to the Law Court admission of such photographs has been upheld as within the trial judge's discretion.* This statement is, however, somewhat misleading. Since the state cannot appeal, the lower court rulings excluding photographs of this type are not reflected in the reported cases. The objection is not a futile one, but counsel should be aware that if the trial court is not persuaded, *the chance of reversal on appeal is virtually nonexistent.*

R. Field and P. Murray, *Maine Evidence* § 403.5 (1976) (footnote omitted) (emphasis added). The correct assertion that this Court has never been presented with a case raising an issue ripe for reversal because of prejudicially erroneous admission of gruesome, inflammatory photographs has significance only in that it demonstrates the fortuitousness of the common-law method of jurisprudence.

■ Wise prosecutors will not be easily seduced by the assertion that, on this issue, "the chance of reversal on appeal is virtually nonexistent." This Court, given a case showing harmful error resulting from improper admission of inflammatory photographs, will afford the prosecutor no relief from the consequences of such error. It is just as much the prosecutor's duty " . . . to see that the accused has a fair trial as it is to bring about a just conviction of the guilty." *State v. Wyman*, Me., 270 A.2d 460, 463 (1970). Yet, sound prosecutorial judgment cuts deeper than the avoidance, alone, of affirmative misconduct. The prosecutor, as counsel for the public interest, is especially bound by the tenets of sound

the time the photograph was taken it could have been taken in a less prejudicial manner. We merely point out steps which the state can take to lessen the potential for prejudice of a photograph, thereby increasing the chances that it will be admitted into evidence.

professional judgment, based upon a thorough knowledge of the law, to avoid jeopardizing *without reason or need* the validity of a just conviction. It is the logical culmination of all of these considerations that high risk-taking by the prosecutor on this issue at trial may well violate the higher standards of professional trial competence and subvert the public interest in the proper performance of the prosecutor's function.

■■■ Where there is error in the record,[4] we must set aside the judgment unless it meets the customary harmless-error standard that the " 'conviction is sure that the error did not influence the jury, or [that it] had but very slight effect.' " *United States v. Agurs,* 427 U.S. 97, 112, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1976), *quoting Kotteakos v. United States,* 328 U.S. 750, 764, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946); *see* M.R.Crim.P. 52(a). One step in applying a harmless-error standard is to assess the strength of the state's evidence against the defendant. *Holloway v. Arkansas,* 435 U.S. 475, 488, 98 S.Ct. 1173, 1180, 55 L.Ed.2d 426 (1978). Here, the evidence against the defendant was overwhelming. The defendant admitted shooting the victim. The sole issue contested was whether the shooting was intentional or accidental. Three witnesses testified to admissions made by the defendant that just before the shooting the defendant thought the victim was reaching for a gun; the admission made to Logan soon after the shooting indicates that the defendant shot the victim *because* he was reaching for something. Thus, the evidence against the defendant is not merely circumstantial. *See Harrington v. California,* 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969) (constitutional error held harmless). Circumstantial evidence also points to the defendant's guilt. The bullet's path through the victim is consistent with the victim reaching down at the time of the shooting. The defendant entered the pool hall with his gun already cocked. He testified that he was not wearing a mask, and did not care whether the victim recognized him (he had been to the pool hall many times before). After the shooting, the defendant took the victim's wallet, leaving the victim moaning on the floor, calmly went to a friend's apartment for an afternoon nap, and that evening went to a disco and played pool. Such evidence renders incredible the defendant's testimony that the shooting was accidental. Thus, we are convinced that the admission of the photograph did not prejudicially influence the jury in reaching its verdict, for the evidence of guilt was overwhelming. The error, therefore, was harmless. *Cf. State v. Thomas,* Me., 432 A.2d 757 (1981) (defendant's admission corroborated other evidence rendering his trial testimony incredible; therefore error in jury instruction "beyond a reasonable doubt did not affect the jury's verdict...."); *State v. Smith,* Me., 394 A.2d 259 (1978) (jury instruction error held harmless beyond a reasonable doubt).

The entry is:

Judgment affirmed.

All concurring.

---

4. The error here does not involve the defendant's constitutional rights.